IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior District Judge Richard P. Matsch

Civil Action No. 13-cv-02053-RPM

GENERAL ELECTRIC COMPANY,
DATEX-OHMEDA INC.,

       Plaintiffs,

v.

JAMES GALBIATI,
JANET BYCHEK,

       Defendants.

---

ORDERS ON MOTIONS FOR SUMMARY JUDGMENT

---

Defendant James Galbiati ("Galbiati") is a named co-inventor of the invention(s) described in United States Patent No. 6,985,762, titled "Network Formatting for Remote Location Oximetry Applications," issued January 10, 2006 ("the '762 Patent"). Datex-Ohmeda Inc. and its corporate parent, General Electric Company ("GE"), claim that Galbiati's interest in the '762 Patent must be assigned to the Plaintiffs under the "hired to invent" doctrine in the common law of Colorado.

Contrary to complaint's jurisdictional allegations, the Plaintiffs' claims do not arise under the United States Patent Act. The sole basis for federal jurisdiction is diversity of citizenship. It is assumed the amount in controversy exceeds $75,000, exclusive of interest and costs, as required by 28 U.S.C. § 1332.

The Plaintiffs moved for summary judgment, arguing that undisputed facts establish their

ownership of Galbiati's interest in the '762 Patent. The Defendants opposed the Plaintiffs' motion and moved for summary judgment because the Plaintiffs' claims are barred by the Colorado statute of limitations applicable to contract claims.

The following facts are undisputed:

Datex-Ohmeda is in the business of developing medical technologies. In the late 1990s, Datex-Ohmeda was developing new technologies related to pulse oximetry, a non-invasive method of monitoring an individual's hemoglobin levels.

Galbiati is a software engineer. He has a Master's degree in that subject, and by the late 1990s, had at least 10 years of experience in that field.

In the summer of 1999, Datex-Ohmeda employed Galbiati through a staffing service known as Manpower Professional. Datex-Ohmeda hired Galbiati to develop software for Datex-Ohmeda's products, and in particular, to model circuits in an electronic drafting program to support one of the company's blood pressure products.

The employment relationship between Datex-Ohmeda and Galbiati was analogous to that of a contractor or consultant. He had no written employment contract with Datex-Ohmeda addressing intellectual property rights.

In the fall of 1999, Galbiati also was working on his own project called PerfusionIndex, developing a means of collecting data from a Datex-Ohmeda pulse oximeter used to measure blood flow in a patient's radial artery. Datex-Ohmeda was aware of the PerfusionIndex project and supplied equipment for it. While working on the PerfusionIndex project, Galbiati realized it could be possible to move data from a pulse oximeter to a computer or server, which would allow a doctor in a hospital to obtain data from a patient at a distant location.

In late 1999, Galbiati's relationship with Datex-Ohmeda was terminated when the company reduced its workforce. Shortly thereafter, Galbiati suggested to Datex-Ohmeda that he should try to implement his plan to have a pulse oximeter communicate with a computer or a server. Galbiati wrote up a proposal, which included writing the system architecture, system design, timelines, and work estimates. He presented the proposal to Datex-Ohmeda, suggesting the work would take approximately six-weeks to complete.

In early 2000, Datex-Ohmeda approved Galbiati's proposal. Galbiati's work on the project took place mostly on site at Datex-Ohmeda's facilities. Galbiati also used some of his own equipment, or his brother's equipment, while working on the project.

The project was completed. Galbiati continued to work for Datex-Ohmeda on other pulse oximetry projects. Datex-Ohmeda paid Galbiati for his work through Manpower Professional.

In 2001 and 2002, Galbiati worked with Datex-Ohmeda's patent attorney, Russ Manning ("Manning"), on the application for the patent that ultimately became the '762 Patent. That application, designated as application number 10/190,888, was filed in the U.S. Patent and Trademark Office on July 2, 2002.

Datex-Ohmeda paid the attorneys' fees for the legal work on the patent application. Galbiati did not pay any attorneys' fees or filing fees associated with the patent application.

Later in 2002, Galbiati's relationship with Datex-Ohmeda was terminated. At that time, patent application 10/190,888 was pending.

In a letter to Galibiati dated February 4, 2003, Manning enclosed a copy of the patent application and two unsigned documents for Galibiati's signature – (1) an inventor's declaration

and (2) an assignment for assigning Galbiati's interest in the patent application to Datex-Ohmeda. Manning's letter to Galbiati stated in part:

> After reviewing the [patent] application, please sign the attached declaration. The declaration is a statement that you, as a named inventor, are an inventor of at least one of the claims in the application. ...
>
> I have also enclosed an assignment assigning your rights in the application to Datex-Ohmeda. This document would need to be notarized. I realize that your post-employment relations with Datex have been strained. Please discuss this document with your attorney. In order to file the application, we do need you to sign the declaration. Please note that the declaration does not need to be notarized and does not by itself assign any rights to Datex ....

Defs.' Ex. 1 [#47-1]. Galbiati apparently signed the inventor's declaration form and returned it to Manning for filing. Galbiati did not sign and return the assignment form sent by Manning.

The '762 Patent issued on January 10, 2006. The patent identifies six co-inventors, including Galbiati.

Over seven years later, on June 24, 2013, counsel for GE contacted Galbiati by phone and asked him to execute an assignment of his interest in the '762 Patent to GE. GE expressly informed Galbiati that GE expected him to sign a written assignment. On June 27, 2013, Galbiati, through counsel, informed GE that he did not believe he had an obligation to assign the '762 Patent to GE.

On August 1, 2013, GE and Datex-Ohmeda filed this action, alleging three claims for relief: (1) declaratory judgment; (2) breach of an implied employment contract, and (3) unjust enrichment. In a second amended complaint, filed October 9, 2014, the Plaintiffs added Galbiati's former wife, Janet Bycheck, as a defendant because she could assert an ownership interest in the '762 Patent due to the fact that Galbiati's work as a co-inventor occurred during their marriage. The Plaintiffs seek a declaration that Datex-Ohmeda is the owner of the

'762 Patent; a declaration that Galbiati and Bychek must assign the '762 Patent to Datex-Ohmeda; specific performance of Galbiati's and Bychek's assignment obligations, and damages in an amount to be determined at trial, together with prejudgment interest, costs and such other relief as the Court deems just.

All three of the Plaintiffs' claims and requested relief depend on application of the hired to invent doctrine. In *Teets v. Chromally Gas Turbine Corp.*, 83 F.3d 403 (Fed. Cir. 1996), the United States Court of Appeals for the Federal Circuit addressed the relationship between invention and ownership of patent rights in the employment context, explaining:

> Ownership springs from invention. The patent laws reward individuals for contributing to the progress of science and the useful arts. See U.S. Const. art. I, § 8. As part of that reward, an invention presumptively belongs to its creator. *See Beech Aircraft Corp. v. EDO Corp.*, 990 F.2d 1237, 1248, 26 USPQ2d 1572, 1582 (Fed.Cir.1993); *Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574, 1578, 19 USPQ2d 1513, 1516 (Fed.Cir.1991). This simple proposition becomes more complex when one creates while employed by another person.
>
> Consistent with the presumption that the inventor owns his invention, an individual owns the patent rights even though the invention was conceived and/or reduced to practice during the course of employment. *Hapgood v. Hewitt*, 119 U.S. 226, 233–34, 7 S.Ct. 193, 197–98, 30 L.Ed. 369 (1886). At the same time, however, the law recognizes that employers may have an interest in the creative products of their employees. *Solomons v. United States*, 137 U.S. 342, 346, 11 S.Ct. 88, 89, 34 L.Ed. 667 (1890). For example, an employer may obtain a shop right in employee inventions where it has contributed to the development of the invention. *McElmurry v. Arkansas Power & Light Co.*, 995 F.2d 1576, 1581–82 (Fed.Cir.1993). A shop right permits the employer to use the employee's invention without liability for infringement. *Id.* at 1580.
>
> In addition, contract law allows individuals to freely structure their transactions and employee relationships. An employee may thus freely consent by contract to assign all rights in inventive ideas to the employer.
>
> Without such an express assignment, employers may still claim an employee's inventive work where the employer specifically hires or directs the employee to exercise inventive faculties. *United States v. Dubilier Condenser Corp.*, 289 U.S. 178, 187, 53 S.Ct. 554, 557, 77 L.Ed. 1114 (1933); *Standard Parts Co. v.*

> *Peck*, 264 U.S. 52, 59–60, 44 S.Ct. 239, 241, 68 L.Ed. 560 (1924). When the purpose for employment thus focuses on invention, the employee has received full compensation for his or her inventive work. *See generally McCoy v. Mitsuboshi Cutlery, Inc.*, 67 F.3d 917, 920–21, 36 USPQ2d 1289, 1291 (Fed.Cir.1995) (finding implied license to sell patented goods by aggrieved seller where patentee breaches sales contract), *cert. denied*, 516 U.S. 1174, 116 S.Ct. 1268, 134 L.Ed.2d 215 (1996). To apply this contract principle, a court must examine the employment relationship at the time of the inventive work to determine if the parties entered an implied-in-fact contract to assign patent rights....

*Teets*, 83 F.3d at 407.

Because the hired to invent doctrine is an implied contract theory, the *Erie* doctrine dictates that state contract principles apply. *See Teets*, 83 F.3d at 407. Here Colorado law applies because Galbiati's relationship with Datex-Ohmeda occurred in Colorado. Colorado appellate courts have recognized the hired to invent doctrine. *See Scott System, Inc. v. Scott*, 996 P.2d 775 (Colo. App. 2000).

"The existence of an implied-in-fact contract to assign inventive rights is a question of fact." *Teets*, 83 F.3d at 408 (citations omitted); *see also Scott*, 996 P.2d at 779 (genuine factual disputes with respect to whether the defendant was hired to invent or to solve a particular problem precluded summary judgment). The most important factual considerations are the employment relationship at the time of the inventive work and the purpose for which the employer hired the employee. The Defendants' response to the Plaintiffs' motion for summary judgment demonstrates there are factual disputes regarding those matters.

Even if the hired to invent doctrine obligates Galibiati to assign his rights in the '762 Patent to the Plaintiffs, their claims fail because the complaint is untimely. Under Colorado law, a claim for breach of contract generally must be commenced within three years after the cause of action accrues. C.R.S. § 13-80-101(1)(a).

The rules of accrual are governed by C.R.S. § 13-80-108, which provides in pertinent part:

> (6) A cause of action for breach of any express or implied contract, agreement, warranty, or trust shall be considered to accrue on the date the breach is discovered or should have been discovered by the exercise of reasonable diligence.

C.R.S. § 13-80-108(6).

The Defendants contend the February 4, 2003 letter from Manning to Galbiati demonstrates Datex-Ohmeda's knowledge that Galbiati had not provided a written assignment of his rights in the subject patent. The Defendants further contend that such knowledge means the Plaintiffs' claims accrued on February 4, 2003.[1]

The Plaintiffs argue their breach of contract did not accrue until the week of June 24, 2013, when Galbiati refused GE's demand for a written assignment.

Manning's letter to Galbiati in February 2003 does show Datex-Ohmeda's knowledge that Galbiati had not provided an assignment of his interest in the patent application for the subject invention(s). The only reasonable construction of Manning's letter is that it includes both a request for a signed inventor's declaration and a request for an assignment of Galbiati's interest in that patent application. Galbiati refused Datex-Ohmeda's request when he failed to sign and return the assignment. Datex-Ohmeda was on notice of the alleged breach in 2003, after Galbiati failed to provide a signed copy of the assignment included in Manning's letter.

---

[1] The Defendants also argue that a letter dated November 5, 2005 from attorney Robert Berube to Galbiati shows that the Plaintiffs' claims accrued at the latest by that date, but Berube's 2005 letter cannot be viewed as a triggering event for accrual of the limitation period because it refers to an application for a different patent.

The '762 Patent issued on January 10, 2006. The issuance of the '762 Patent should have prompted Datex-Ohmeda to review its files and ensure that it had acquired ownership of the rights of all the co-inventors.

This action was filed on August 1, 2013, more than seven years after the '762 Patent issued. The Plaintiffs, in the exercise of reasonable diligence, should have discovered their claim more than three years before August 1, 2013.[2]

The Plaintiffs argue that application of the statutory limitations period would preclude only their request for damages for breach of contract, but not their claims for declaratory relief or unjust enrichment. That argument fails.

There is no express statute of limitations for a declaratory judgment claim. "What determines the applicable limitations period is 'the basic nature of the suit in which the issues involved would have been litigated if the Declaratory Judgment Act had not been adopted.'" *118 E. 60th Owners, Inc. v. Bonner Props., Inc.*, 677 F.2d 200, 202 (2d Cir.1982) (quoting *Romer v. Leary*, 425 F.2d 186, 188 (2d Cir. 1970)). "When the declaratory judgment sought by a plaintiff would declare his entitlement to some affirmative relief, his suit is time-barred if the applicable limitations period has run on a direct claim to obtain such relief." *118 E. 60th Owners,* 677 F.2d at 202; *see also Bechler v. Kaye*, 222 F.2d 216, 220 (10th Cir.1955) ("The nature of the cause of action determines the applicable statute of limitations." )

---

[2] Pursuant to C.R.S. § 13-80-103.5, a six-year limitation period applies to certain types of actions. That statutory limitation period is not applicable here, but the result would be the same if it did.

The Plaintiffs' claim for declaratory judgment is premised on allegations of an implied contract. Accordingly, that claim is governed by C.R.S. § 13-80-101(1)(a) and the rule of accrual stated in C.R.S. § 13-80-108(6).

Colorado has no statutory limitation period for a claim of unjust enrichment. "[U]njust enrichment claims, being equitable in nature .. are technically subject to an equitable laches rather than a legal statute of limitations analysis." *Interbank Investments, L.L.C. v. Vail Valley Consol. Water Dist.*, 12 P.3d 1224, 1229-30 (Colo. App. 2000). "The elements of laches are: (1) full knowledge of the facts; (2) unreasonable delay in the assertion of available remedy; and (3) intervening reliance by and prejudice to another." *Hickerson v. Vessels*, 316 P.3d 620, 623 (Colo. 2014)(citations omitted).

Nevertheless, "in the absence of extraordinary circumstances, [a court of equity] will usually grant or withhold relief in analogy to the statute of limitations relating to actions at law of like character." *Brooks v. Bank of Boulder,* 911 F.Supp. 470, 476-77  (D. Colo. 1996) (quoting *Shell v. Strong*, 151 F.2d 909, 911 (10th Cir.1945)); *see also Interbank Investments*, 12 P.3d at 1229-30.

The Plaintiffs' claim of unjust enrichment, like their claim of unjust enrichment, is predicated on an alleged implied contract. Thus Colorado's statute of limitations for contract actions applies to that claim, unless the Plaintiffs prove circumstances showing that equity requires a different analysis. *See Interbank Investments*, 12 P.3d at 1230 ("[B]ecause plaintiff did not present any evidence of extraordinary circumstances, we ... will apply the statute of limitations analysis applicable to plaintiff's contract claims to the laches analysis applicable to

the unjust enrichment claims."); *Rotenberg v. Richards*, 899 P.2d 365 (Colo.App.1995). The Plaintiffs have not shown any such extraordinary circumstances.

Based on the foregoing it is

ORDERED the Plaintiffs' motion for summary judgment [#45] is denied, and it is

FURTHER ORDERED the Defendants' motion for summary judgment [#47] is granted.

The Clerk shall enter judgment dismissing this action and awarding costs.

Dated: March 12, 2015

                                  BY THE COURT:

                                  s/Richard P. Matsch

                                  _____

                                  Richard P. Matsch, Senior Judge